445 So.2d 1023 (1983)
LOUISVILLE and NASHVILLE RAILROAD COMPANY, a Kentucky Corporation Authorized to Do Business in Florida, and E.E. York, Appellants,
v.
Charles G. HICKMAN and Mary Hickman, His Wife, Appellees.
No. AK-377.
District Court of Appeal of Florida, First District.
April 12, 1983.
Rehearing Denied October 6, 1983.
*1024 DuBose Ausley and William M. Smith of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for appellants.
Stanley Bruce Powell of Powell, Powell & Powell, Niceville, for appellees.
LARRY G. SMITH, Judge.
Appellants appeal an adverse jury verdict awarding compensatory damages in the amount of $50,000.00 each to Mr. and Mrs. Hickman, and assessing $7,000,000.00 in punitive damages against the defendant, Louisville and Nashville Railroad. Appellants raise the following issues:
(1.) A new trial on all issues is required because plaintiffs' testimony contained elements of fraud and misrepresentation.
(2.) The issue of punitive damages should not have gone to the jury.
(3.) The punitive damage award is preempted by comprehensive federal laws and is also unconstitutional.
(4.) The $7,000,000.00 punitive damage award is clearly excessive.
(5.) The trial court committed numerous evidentiary and procedural errors.
Appellees cross-appealed, asserting that there was no newly discovered evidence and the trial court erred in granting a new trial on Mrs. Hickman's consortium claim.
This case arises out of the derailment of a Louisville and Nashville Railroad (L & N) train occurring in Okaloosa County, Florida. The train in question was over a mile and a half long and weighed 11,500 tons. Sixty-seven of the cars contained hazardous chemicals. The derailment occurred on April 8, 1979.
On that day the plaintiff, Charles Hickman, then 61 years old, went to check the fishing conditions in the Yellow River. He parked his pickup truck about 100 feet below the L & N trestle which crosses the river. The train was going across the trestle when he pulled up to the bluff. He testified that the train was travelling faster than he remembered seeing a train travel on that track. Moments after he arrived, a rumbling sound began in the trees behind him, and when he turned around, he saw *1025 railroad cars flying into the air. He knew that his way back to the highway would be blocked by the wrecked train, so he headed downriver. A few hundred feet downriver he stopped his truck and started to get out; it was just like he had been hit in the face with a tear gas bomb; he could neither see nor breath. He slammed the truck door, covered his face with a handkerchief, and waited until his eyes cleared. At that time, he saw a three foot deep fog all over the ground. Eventually, a light breeze came up and blew the heavy part of the fog away. He put his handkerchief over his mouth and nose and ran from the truck. There was an explosion before he got up the hill, then a second explosion, bigger than the first, when he got to the top of the hill. He met some firemen at the top of the hill, was given first aid, and carried to the hospital in an ambulance. He stayed there four days. Subsequently, he was forced to retire from his job because of the lung condition caused by the inhalation of poisonous gases. Mr. Hickman filed suit against L & N Railroad, E.E. York, the engineer of the train, W. Johnson, the conductor, and John Durgens, the brakeman. Mr. Hickman's wife, Mary, joined the suit seeking loss of consortium.
Prior to trial the plaintiffs filed a request for admissions. The defense did not respond to the request until 125 days after filing. Its response consisted of a motion to strike the admissions on the grounds that they were contained in a report of the National Transportation Safety Board and that 49 U.S.C., Section 1903(c) prohibited the use of such reports in civil trials.[1] The trial court denied the motion to strike, and appellants argue that the court erred in so doing.
Federal courts have consistently interpreted Section 1903(c) to prohibit the use of the agency's findings and conclusions only when they are identified as such. This is to prevent the findings from being given undue weight by the jury. See, Berguido v. Eastern Airlines, Incorporated, 317 F.2d 628 (3rd Cir.1963), cert. den. 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124; American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir.1969). See also, Ratner v. Arrington, 111 So.2d 82 (Fla. 3rd DCA 1959). The request for admissions contained findings and conclusions of the agency but did not identify them as such. The court was correct in denying the motion to strike, and permitting the admissions to go to the jury. The following facts were admitted:
(1.) The total tonnage of train number 403 was greater than that recommended by AAR Train Track Dynamics Guidelines for the grades and curves in the derailment area.
(2.) The actual weight of train number 403 was 732 tons greater than the weight indicated on its train consist information.
(3.) The track approaching the derailment site was a combination of curves and grades that required special train make-up and train handling characteristics.
(4.) The train was not slowed adequately before entering the sag as recommended by L & N Rules and AAR Track Train Dynamics Guidelines.
(5.) Train 403 derailed while moving around a four degree two minute curve. Twenty-nine cars and twenty-eight tank cars derailed.
(6.) Locomotive Unit 4129 had been malfunctioning by shutting itself down on the day of the derailment. It had shut down three times prior to the derailment occurring and had to be restarted each time by the engineer. Following the derailment it was found to be shut down again.
(7.) The train had insufficient power to pull the grade into Crestview from Yellow River Bridge.
(8.) This derailment occurred because of a large compressive force generated between the thirty-sixth and thirty-seventh *1026 cars which was caused by one or a combination of the following: A. Excessive train tonnage, B. Improper train handling.
The tract in the area of the Yellow River trestle crosses sag and dip terrain. In addition, the path taken by the train required it to negotiate a two degree curve followed by a three degree curve while proceeding downhill to the river. After crossing the trestle, the train began to move uphill, and while doing so was required to negotiate a four degree two minute curve, followed by a four degree fifteen minute curve, then a four degree curve. The train derailed when the lead locomotive was in the vicinity of this final curve.
American Association of Railroads (AAR) and L & N Rules recommend that train speed be reduced prior to entry into such an area. The rules also recommend that no brake applications be made in such an area so as to prevent excessive slack adjustment within the train which could result in breakage or derailment.[2]
The track speed limit prior to entry into the Yellow River trestle area is 49 miles per hour. The speed limit within the Yellow River trestle area is 35. Witnesses testified that the train was travelling in excess of 55 miles an hour prior to its entry into the Yellow River trestle area. Evidence from L & N's engineer shows that the train was travelling 40 miles an hour on the downgrade approaching the Yellow River in spite of five brake applications, including two full service applications. A little more than one-half of the train was across the river when the derailment occurred. When the brakes went into emergency immediately following the derailment, the locomotive was travelling at 35 miles an hour.
Engineer E.E. York was familiar with the AAR Guidelines recommending that the tonnage of a train be limited to 8,000 tons when it is negotiating curves over two degrees or grades over one percent at 35 miles an hour. The train that morning weighed 11,500 tons. It was one and one-half miles long. He was also aware of the rules recommending that no brake applications be made within, near the beginning, or near the end of a curve in excess of two degrees. Nevertheless, he made five applications in the area because conditions demanded it. He testified that he had had trouble on that grade before, such as broken knuckles, and drawheads. He has also failed to make the grade in the past.
The conductor, W. Johnson, testified that L & N had never informed him of the rule recommending a train be limited to 8,000 tons if it is to negotiate a one percent grade at 35 miles per hour. As conductor, he has the right to pull cars off the train if it is overweight, but L & N decides how heavy and how long a train will be, and the crew just operates it. His only function is to compute the horsepower versus the tonnage to determine if the train is overweight. Based on the horsepower available, he was of the opinion that the train was incapable of taking the Crestview grade at 30 miles per hour. He thought that at best it could take the grade at 8 to 12 miles per hour.
The plaintiffs' expert, Rolf Roley, testified that there is no "fudge factor" in the AAR Rules. An 11,500 ton train on a one percent grade at 30 miles per hour is grossly overloaded. He was of the opinion that if an engineer were required to perform three braking operations at the end of which he was still going 40 miles per hour *1027 downgrade, the train would be completely out of control.
With regard to her loss of consortium claim, Mrs. Hickman testified that she and her husband had been married for 28 years, and had had no marital problems as a result of the accident. After trial, appellants discovered that Mr. and Mrs. Hickman had been divorced twice, once prior to and once after the accident. The trial court ordered a new trial on the question of Mrs. Hickman's loss of consortium claim, but denied the remainder of appellants' post-trial motions.
Relying on Alston v. Shiver, 105 So.2d 785 (Fla. 1958), appellants argue that a new trial is required on all issues because of the falsity of Mrs. Hickman's testimony. In Alston, the Supreme Court noted that one of the prerequisites for granting a new trial on the basis of newly discovered evidence is that the evidence be such that it would probably change the result of the case upon a new trial. The court said that because of objection to the general rule, and because of the courts' and the public's abhorrence of false testimony, an exception to the rule had been established. Thus, where it is shown that the prevailing party knowingly gave or used false testimony, a new trial on all issues is allowable at the court's discretion without it having to be first shown that the newly discovered evidence will probably produce a different result on a new trial. The court observed that the trial judge had not exercised his discretion because he felt he was precluded from doing so by Townsend v. Gibson, 67 So.2d 225 (Fla. 1953). The court said the case was not controlled by Townsend, but by Ogburn v. Murray, 86 So.2d 796 (Fla. 1956).
In Ogburn, the plaintiff testified falsely as to his post-injury wages. The court agreed with counsel for the defendants that it could not have been anticipated that the plaintiff would give false testimony as to his earnings, even though it might have been expected that counsel for the plaintiff would attempt to prove loss of past and future wages as one element of the damages sought in the action. The court went on to say that even if the defendants and their counsel were technically at fault in failing to have this evidence available at trial, the rule as to newly discovered evidence is not inflexible and must sometimes bend in order to meet the ends of justice. At 798. The court concluded that it could think of no more appropriate situation for "bending" the rules than the one presented, i.e., where the only reasonable and logical inference is that the plaintiff deliberately falsified his earnings. See also, Drew v. Chambers, 133 So.2d 589 (Fla. 1st DCA 1961).
Taken together, these cases stand for the proposition that (1) a party is not required to anticipate false testimony from the opposing party, and is, therefore, not required to discover evidence which would refute the false testimony; and (2) that where the plaintiff testifies falsely concerning a material fact, or relies on false testimony concerning a material fact, the opposing party in moving for a new trial is not required to show that the newly discovered evidence would alter the course of the trial. However, such a motion is directed to the sound discretion of the trial judge. Alston v. Shiver; Ashland Oil, Inc. v. Pickard, 289 So.2d 781 (Fla. 3rd DCA 1974), cert. den. 300 So.2d 897 (Fla. 1974). In the instant case, while Mrs. Hickman's false testimony was material with regard to her derivative claim, her testimony with regard to Mr. Hickman's injuries was merely cumulative. Accordingly, on this record, we cannot say that the trial court abused his discretion in granting a new trial as to Mrs. Hickman's claim only.
Appellants also argue that punitive damages are not available to a private individual in a negligence suit because Congress has preempted state regulation of railway safety. Appellants rely upon Silkwood v. Kerr-McGee Corp., 667 F.2d 908 (10th Cir.1981). We disagree. Preemption does not automatically apply merely because Congress has acted in such a way as to affect a given industry. Florida Lime and Avacado Growers, Inc. v. Paul, 373 U.S. 132, *1028 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), reh. den. 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082. Preemption will not be presumed, and even where it is clear that preemption applies, state law is invalid only to the extent that it is preempted. People of the State of Illinois v. Kerr-McGee, 677 F.2d 571, 579 (7th Cir.1982); State, etc. v. Southeastern Fisheries Ass'n., 415 So.2d 1326 (Fla. 1st DCA 1982). Additionally, cases dealing with the question of preemption as it applies to the nuclear power industry have only limited application to the instant question, because that industry was initially developed by the federal government, with the states only recently moving into the field, and because the industry is so closely associated with national security. Cf. 667 F.2d at 579 n. 16.
Finally, appellants argue that the amount of punitive damages is excessive.[3] We tend to agree, but recent Florida Supreme Court decisions have left us with very restricted powers of review in this area. See, Wackenhut Corp. v. Canty, 359 So.2d 430, 441 (Fla. 1978) (Judge Robert Smith dissenting). Post-Wackenhut, it is still proper to issue an order for new trial or remittitur where the manifest weight of the evidence shows that the amount of punitive damages assessed is out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct. But, either this finding must be affirmatively supported by the record, or the judge must find that the jury was influenced by matters outside the record. Arab Termite and Pest Control v. Jenkins, 409 So.2d 1039 (Fla. 1982). The trial judge declined to order a new trial, or a remittitur, and we are unable to find the requisite affirmative showing in the record.[4] There is no indication that the jury was influenced by matters outside the record.
It is also still proper to set aside the jury's verdict if it appears that the award is out of all proportion to the defendant's net worth. Id. at 1043. However, at trial L & N introduced no evidence concerning its net worth. It did not contend at trial, nor does it contend here, that the award is sufficient to cause financial hardship. In absence of any evidence as to L & N's net worth, we cannot say that the award was excessive. Bould v. Touchette, 349 So.2d 1181, 1187 (Fla. 1977). Appellants have failed to demonstrate that the trial court abused its discretion in refusing to grant a new trial or a remittitur. Lassitter v. International Union of Operating *1029 Engineers, 349 So.2d 622, 627 (Fla. 1976).
Appellants' remaining points on appeal being without merit, the judgment appealed from is due to be and is hereby
AFFIRMED.
JOANOS, J., and SHAW, LEANDER J., Jr., Associate Judge, concur.

ON DENIAL OF MOTION FOR REHEARING
PER CURIAM.
Louisville and Nashville Railroad Company's appellate counsel, who were not trial counsel below, have filed a lengthy motion for rehearing and motion for rehearing en banc. The panel, consisting of Judge Smith (L.), Judge Joanos, and Judge Zehmer,[5] has considered appellant's motions and attachments, appellees' response, and the supplemental authorities filed by both parties. In addition, Judge Zehmer has fully reviewed the record on appeal and the briefs of the parties, and has had the benefit of listening to the tape recording of the oral arguments presented before the original panel of this court.
Appellant's motions consist essentially of a re-argument of the case, placing renewed emphasis, among other things, upon the amount of punitive damages, and the disparity between the punitive damage award and the compensatory damages awarded to appellee Charles G. Hickman. We find that these arguments relating to the issue of excessiveness of the award and other issues were fully considered and addressed in the original opinion in keeping with what we consider to be the controlling principles announced by the Florida Supreme Court. We therefore adhere to our original opinion as to all issues raised on this appeal.
The motion for rehearing is DENIED.
LARRY G. SMITH, JOANOS and ZEHMER, JJ., concur.
NOTES
[1] 49 U.S.C. § 1903(c) provides:

No part of any report of the Board, relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports.
[2] Plaintiffs' evidence explaining slack action was uncontroverted. Slack in a train amounts to six to eight inches per car. Run-in occurs when the rearend of the train tends to catch up with the front end. Run-out occurs when the train stretches. If run-in is excessive, it can cause a collision within the train  a slack action collision  which is very dangerous. The seriousness of a slack action collision does not depend so much on the speed of the train as on the load and running characteristics of the cars  light car versus heavy car. It is not advisable to brake in sag and dip terrain because it takes so long for air pressure to get to the back of the train, causing the front to decelerate before the rear, which increases run-ins. The forces generated as a consequence of run-ins can cause a light car to be "buffed off" the track. Similarly, excessive slack action on a curve can cause a roll-over derailment.
[3] The question of punitive damages was properly submitted to the jury. There was evidence from which it could have found that L & N systematicly made up overweight trains and required them to be run through the area at the maximum allowable speed, without regard to industry guidelines, its own train handling rules, or the hazardous nature of the cargo carried; and that L & N persisted in those infractions in spite of numerous previous problems, such as breakage, caused by them. The jury could also have found the engineer drove a grossly overweight train, knowing it was loaded with hazardous chemicals, at speeds well in excess of the maximum permissible, without regard to safe handling rules, and with full knowledge of the risks involved. See, Mercury Motors Exp. Inc. v. Smith, 393 So.2d 545 (Fla. 1981).
[4] This is probably a classic example of the type of case described by Mr. Justice Adkins in Lassiter v. International Union of Operating Engineers, 349 So.2d 622, 626 (Fla. 1976), "... where the conduct by a very affluent defendant is outrageous but the resultant injury or invasion of legal rights to the plaintiff is minimal, although the conduct has the propensity of causing great harm if continued... ." Of course, there was no direct evidence here that the L & N was "very affluent." Nonetheless, the jury did not need a balance sheet to know that railroad operations of the duration and magnitude indicated by the evidence are not conducted by penniless, small-time corporations. Furthermore, the amount of the punitive damage award could also have reflected the jury's reaction to the evidence of L & N's assessment of its own damages as running in excess of one million dollars in lost equipment, cargo, engineering and repair costs. The query might well have been: if L & N appeared willing to expose itself to property damages of this extent, not to mention the risks to its own personnel, what amount of punitive damages would be necessary to get L & N's attention, and deter it (and others) from similar conduct in the future? Viewed in this light, particularly in view of the evidence tending to show that the negligent practices disclosed were not a one-time occurrence, the punitive damage award of seven million dollars takes on a more realistic hue.
[5] Judge Zehmer succeeded Judge (now Justice) Shaw as a panel member upon Justice Shaw's elevation to the Supreme Court of Florida.