531 So.2d 381 (1988)
Grady ALBRITTON, Appellant,
v.
Louise GANDY, Appellee.
No. 87-1355.
District Court of Appeal of Florida, First District.
September 13, 1988.
*383 Robert N. Heath, Jr., of Harrell, Wiltshire, Stone & Swearingen, P.A., Pensacola, for appellant.
John Barry Kelly II, of Ray & Kievit, Pensacola, for appellee.
SHIVERS, Judge.
In this case, appellant Grady Albritton (Albritton) appeals the trial court's affirmance of the jury's verdict finding that he tortiously interfered with appellee Louise Gandy's (Gandy's) employment as a relief emergency medical technician with Escambia County. Appellee Gandy cross-appeals the trial court's post-trial order rejecting the jury's verdict finding for Gandy and against Albritton on Gandy's claim that Albritton tortiously interfered with her employment with University Hospital. Additionally, Gandy cross-appeals the trial court's order granting Albritton's motion for new trial on the issue of punitive damages.
The facts relevant to this appeal are as follows. In September of 1983, the citizens of Escambia County voted to elect the Board of County Commissioners. Both Gandy and Albritton were among the six candidates running for the District Five seat. Albritton, a former commissioner, was seeking a return to the Board, whereas Gandy sought political office for the first time. In order to run for the office of county commissioner, Gandy was required to resign her position of Director of Emergency Medical Services for Escambia County. Because none of the candidates obtained a majority of the votes in the September election, the two candidates with the highest number of votes, one of whom was Albritton, were included in a runoff election. Prior to the runoff election, Albritton called upon Gandy at her residence and requested her support in his bid for reelection. During the course of this meeting, Gandy testified that Albritton told her he would get her job back as Director of Emergency Medical Services if she would *384 support him. Gandy testified that she was shocked at this offer and told Albritton that she thought he was dishonest, that he should not be in county government, and that she was not going to support him. According to Gandy:
He [Albritton] got very angry at that point and said well, he was going to win and that when he did he would see I never got another county job for Escambia County, Florida.
On November 1, 1983, before Albritton took office, Gandy obtained a full-time position as Community Ombudsman at University Hospital. At that time, University Hospital was operated by an outside consulting firm. As ombudsman, Gandy acted as a liaison between the hospital administrator and staff as well as the client community. She monitored patient administration and care at the hospital's substation in Century. Moreover, she was charged with the responsibility for disaster preparedness, equipment maintenance and fire safety. In connection with these latter responsibilities, she rewrote the Fire Safety and Disaster Control Manual. The assistant administrator of the hospital testified, as did Gandy's supervisor, that Gandy's responsibilities, particularly in the area of disaster preparedness and fire safety, were "critical" to the operation of the hospital.
Albritton became a county commissioner on November 15, 1983. Thereafter, he called the county administrator, Rodney Kendig, into his office and inquired about Gandy's employment. Kendig responded that Gandy was not working for the county but was employed by an outside consultant at University Hospital. Kendig explained that because of this, "it was not the administrator's prerogative to discharge Ms. Gandy." Kendig testified that Albritton was unhappy with this information and that Albritton expressed strong sentiments that Gandy should not continue in her employment. Kendig testified to his conversation with Albritton as follows:
He indicated he was not at all pleased that Louise Gandy was employed by the hospital... . My recollection of his tone of voice was that he was very distressed, very agitated... . My recollection was that the Commissioner was not at all pleased, that he was very uncomfortable with Ms. Gandy working at University Hospital. He expressed to me his belief that he did not think that she should be an employee of Escambia County, that he did not want Ms. Gandy working in Escambia County.
Kendig explained that he had a subsequent conversation with Albritton after Albritton learned that Gandy was working at University Hospital's Century substation. Kendig testified that Albritton "again expressed his discomfort or the fact that he was not comfortable with Ms. Gandy working for the hospital. I again responded that she was functioning through the management firm." During these discussions, Kendig testified that Albritton gave no reason why Gandy should not be working at University Hospital, and Kendig testified that he was aware of nothing detrimental in Gandy's performance or prior work experience that would make her an unsuitable employee.
Regarding the role of a county commissioner, Kendig explained that the county commission is the "policy-making body for the Escambia county government" and that the county administrator was responsible for county employment matters. Commissioners Junior, Kelson, and Waltrip all testified that the county commission is responsible for making policy, while the county administrator is solely responsible for the hiring, firing and disciplining of county personnel. Each of these commissioners expressed his opinion that it would be improper for a county commissioner to step over the line of his authority and responsibility to induce a county administrator to discharge an employee.
On September 7, 1984, Gandy obtained part-time employment with the county as a relief emergency medical technician (EMT). In that capacity, Gandy was one of 17 relief EMTs who made themselves available for duty when full-time EMTs were ill or on vacation. Although this was a civil service position, Gandy had no employment contract, and Gandy waived certain benefits such as sick leave, annual leave, and seniority. Although she was not guaranteed *385 work or a specific number of hours, Gandy testified that she was told she would be rotated for work with the other relief EMTs on a fair and equal basis.
In November of 1984, Kendig resigned his position as county administrator and Charles Bates became acting county administrator. Sometime thereafter, Albritton discussed Gandy's employment with Bates. According to Bates, Albritton told him "that he would rather she [Gandy] did not do any work for Escambia County." Bates testified that "[i]t was quite evident to me that [Albritton] was rather serious about that... . I'm not sure that I know how to describe his tone of voice. It was firm." The day after his conversation with Albritton, Bates spoke with the county Emergency Medical Services Director, Bruce Yelverton. Bates testified that he asked Yelverton not to call Gandy for any more service as a relief EMT. Bates testified that he had no intention of initiating plans to stop Gandy's part-time relief work prior to his discussion with Albritton and that he knew nothing about Gandy's job performance or personal life which would make her unsuitable for such employment. However, on cross-examination, Bates testified that he initially concurred with Albritton's preference that Gandy not work as a relief EMT and that he was aware that other commissioners expressed concern about Gandy's employment as a relief EMT.
Yelverton described his conversation with Bates as follows:
He [Bates] advised me that a couple of county commissioners were aware of Ms. Gandy working for the Emergency Medical Services as an EMT relief... . and at their direction Mr. Bates advised me that  they requested that she be terminated. He advised me just not to work her.
According to Yelverton, Bates did not tell him who had directed Bates to terminate Gandy, and Yelverton never asked the identity because "I didn't really want to know at that time." On cross-examination, Yelverton testified that Bates told him that the commissioners wanted Gandy terminated because of an audit performed by the comptroller and Gandy's involvement in that audit. However, neither Bates nor Robert Sims, an emergency medical services operations manager who was present at the meeting between Bates and Yelverton, recalled any discussion about an audit.
Immediately after his conversation with Bates, Yelverton wrote an instruction, dated January 25, 1985, in the emergency medical services supervisor's log book to the effect that Gandy was not to be scheduled for any relief work. Gandy's name was later crossed off the EMT roster by Sims with the notation "not to be called." Gandy was not called to work as a relief EMT after January of 1985. Yelverton testified that he would not have written the order in the log book if county administrator Bates had not instructed him to do so. He further testified that he was aware of nothing in Gandy's background that would have made her not qualified to continue working as a relief EMT.
After Bates' conversation with Albritton regarding Gandy's employment as a relief EMT, Bates testified that Albritton had another discussion with him concerning Gandy's full-time employment at University Hospital. This conversation took place while the hospital was being operated by the outside management firm. Bates testified that when he informed Albritton that Gandy was employed by the consulting firm, Albritton responded that "[w]e will have to do something about that."
In March of 1985, Escambia County cancelled the contract with the consulting firm that had been operating University Hospital, and the county took direct control over the operation of the hospital. Bates was responsible for the operation of the hospital until his successor, August Ellis, became the county administrator in April of 1985. Bates testified that the county was in the midst of a lawsuit which had been brought by the consulting firm against the county. As a result of this suit, Bates testified that he and his staff were primarily concerned with (1) the county's culpability in the lawsuit, (2) the financial situation of the hospital, and (3) what, if any, positions at the hospital should be eliminated. According to Bates:

*386 None of us, quite frankly, knew anything about hospital administration and were really feeling our way along... . [W]e looked at ... things like how people in the community felt, including commissioners, about certain key people in the hospital and their role and where we were in.
Bates testified that he was aware at that time that Albritton did not want Gandy working for the county, and he testified he specifically expressed Albritton's sentiments to his successor, August Ellis. Ellis testified that Bates was responsible for briefing him about the condition of the hospital and the personnel to be terminated. Ellis further testified that he "relied on Mr. Bates primarily" and that he listened to him "very carefully." Ellis testified that Bates listed Gandy as one of the persons to be terminated, and Ellis testified that he terminated her. However, Ellis also testified that Gandy was terminated for purely financial reasons and that it was his opinion that her position as ombudsman was not a critical position for the ongoing operation of the hospital. Ellis testified that Albritton's feelings about Gandy had nothing to do with his termination of Gandy and that his termination was based "on the facts that were presented to me and the necessity to reduce our expenditures. I did what I had to do." However, Ellis admitted that he had very little previous hospital administrative experience and that, although he had a general understanding of the term "ombudsman" at the time of Gandy's discharge, he did not know what Gandy's responsibilities were. Ellis testified that he was unaware that Gandy was involved in the areas of fire safety and disaster control. Ellis further indicated that he had never spoken to Gandy or her supervisor prior to Gandy's discharge.
Comptroller Flowers testified that at the time of Gandy's discharge, the comptroller was completing an audit of University Hospital and that various unauthorized expenditures by hospital personnel were cited in the audit. He testified that some of Ms. Gandy's expenditures, including travel expense vouchers, were called into question in the audit. Comptroller Flowers testified that some $963 of expenditures were disallowed to the hospital because the hospital management approved and paid Ms. Gandy for those expenses.
Prior to the termination of her position at the hospital, Gandy was earning between $25,000 and $26,000 a year in her full-time position as Ombudsman. As an EMT relief, she was paid $6.11 per hour for an eight-hour shift and less for longer shifts. Although Gandy was never guaranteed certain hours, Yelverton testified that there were procedures in place to be sure that everyone on the relief roster was given an equal share of the available work. According to the emergency medical services' pay records compiled by Sims, Gandy's smallest paycheck for a two-week period was $104.75 and the largest was $346.70.
Following her loss of employment, Gandy was unable to find work at the health department or area hospitals. She had to borrow money and sell various assets. Gandy testified that as a result of losing her county employment, she has suffered damage to her personal and professional reputation and mental and emotional distress. She detailed her frustration in not obtaining other gainful employment and her struggles in starting a family-run nursery business.
As a result of her termination from her employment, Gandy filed suit against Albritton on November 18, 1985. In her complaint, Gandy alleged that Albritton tortiously interfered with her business relations with Escambia County by inducing her termination as ombudsman at University Hospital and by forcing the county administrator to see that she was not called to work as a relief EMT. The case was tried before a jury on March 2-4, 1987. At the trial, Albritton testified that he never made any threats to Gandy during his campaign for county commissioner. Additionally, he swore that County Administrators Kendig and Bates had lied about Albritton's discussions with them concerning Gandy's employent. At the close of the plaintiff's case and at the close of all the evidence, Albritton moved the trial court for a directed verdict on both counts. Both *387 motions were denied. The jury returned a verdict in favor of Gandy on both counts, awarding $845,000 in compensatory damages for Count I (ombudsman), $335,000 compensatory damages for Count II (part-time relief EMT), and $1,000,000 in punitive damages. In response to the jury verdict, Albritton filed a Motion for New Trial and Motion for Judgment in Accordance with Motion for Directed Verdict. On September 2, 1987, the trial court granted Albritton's Motion for Directed Verdict as to Count I (ombudsman), granted a new trial on the issue of punitive damages only, and denied the remainder of Albritton's motion, including his request for a new trial on Count II (part-time relief EMT). The court further found that Albritton's statements and actions were not privileged and were not subject to absolute immunity and that a county commissioner can be held liable for tortiously interfering with a business relationship between an individual and the county.
We agree with the trial court that Albritton is not immune from a suit based upon statements made and actions taken by him and that a county commissioner may be sued for tortious interference with county employee's employment under the facts of this case. To begin with, although statements made by government officials are protected by absolute immunity in certain situations, in order for immunity to attach, the statements must be made within the scope of the official's duties and powers. Hauser v. Urchisin, 231 So.2d 6 (Fla. 1970); McNayr v. Kelly, 184 So.2d 428 (Fla. 1966); Johnsen v. Carhart, 353 So.2d 874 (Fla. 3rd DCA 1977). These courts hold, based on the case of Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), that in actions against a government official for defamation, public officials are protected by absolute immunity no matter how false or malicious or badly motivated a statement may be as long as the statements or actions fall within the "scope of duty" of the public official.
Thus, if the underlying action performed by the public official was within the scope of his duties, a malicious and false statement made during the exercise of this duty is absolutely privileged. In the case of McNayr v. Kelly, the court found that if it is within the scope of a public officer's duty to discharge an employee and give reasons for doing so, a statement by the public official regarding the reasons for the dismissal of the employee is absolutely privileged and the public official is absolutely immune from a suit based on that statement. See also Densmore v. City of Boca Raton, 368 So.2d 945 (Fla. 4th DCA), cert. denied, 378 So.2d 343 (Fla. 1979). However, as stated by the court in Densmore, 368 So.2d at 947-948:
On the other hand, in order to invoke the doctrine the official must have been acting within the scope of his powers. For instance, if the city personnel rules prohibited the release of information concerning the discharge of an employee, the [official] would probably be acting beyond the scope of his duties if he disclosed such information. Likewise, if there was no official purpose, such as in explanation of the discharge of an employee, upon which to base the disclosure of personal information about an employee, then the official might not be able to invoke the privilege.
In the instant case, Albritton argues that the statements he made and actions he took regarding Gandy were within the scope of his authority. However, a review of the evidence indicates that this is not true. The statements made by Albritton were not made while Albritton was exercising an official duty. Albritton was not in charge of hiring or firing, and thus, there was no official purpose for Albritton's statements regarding Gandy's county employment.
These facts also justify the trial court's finding that Albritton may be held liable for tortiously interfering with Gandy's employment with Escambia County. A cause of action for tortious interference with a business relationship exists only against persons who are not parties to the business relationship. Rabren v. Gulf Towing Co., Inc., 434 So.2d 340 (Fla. 2d DCA 1983); West v. Troelstrup, 367 So.2d 253 (Fla. 1st DCA 1979). In the instant *388 case, although Albritton is a county commissioner for Escambia County, that fact does not make him a party to Gandy's employment relationship with the county. In West, the plaintiff sued the executive director of the Florida Department of Criminal Law Enforcement (FDCLE) for wrongful interference with the plaintiff's employment relationship. In finding that an action for tortious interference could not lie against the executive director, the court noted that the executive director had the power to terminate the plaintiff's employment. Because the executive director was the person through whom the FDCLE must act, the court held that the executive director must be considered as a party to the employment relationship. Id. at 255. In the instant case, a county commissioner does not have the authority to hire and fire employees on behalf of the county. Rather, the person with such authority is the county administrator. Therefore, it cannot be said that Albritton is a party to the employment relationship, and an action for tortious interference may be filed against Albritton.
We also affirm the trial court's order refusing to grant Albritton's post-trial motion for new trial and directed verdict on the issue of Albritton's interference with Gandy's employment as a relief EMT. We agree with the trial court that the jury's verdict on this issue is supported by the evidence. Additionally, we agree that the jurors' award of past and future lost wages in the amount of $35,000 and the jurors' award of $300,000 for past or future injury to Gandy's reputation and mental and emotional distress due to Gandy's loss of employment as a part-time relief EMT does not constitute a basis for an award of a new trial. To begin with, as stated by the Florida Supreme Court in the case of Allred v. Chittenden Pool Supply, Inc., 298 So.2d 361, 365 (Fla. 1974), "[g]reat effect is given by our judicial system to the fact-finder's award of damages" and "[t]he fact that a damage award is large does not in itself render it excessive nor does it indicate that the jury was motivated by improper considerations in arriving at the award." Furthermore, a grant or denial of a new trial based on the amount of a jury's award is within the sound discretion of a trial judge. Id.; Zambrano v. Devanesan, 484 So.2d 603 (Fla. 4th DCA), rev. denied, 494 So.2d 1150 (Fla. 1986). Finally, "the correctness of the jury's verdict is strengthened when the trial judge refuses to grant a new trial or a remittitur." Lassiter v. International Union of Operating Engineers, 349 So.2d 622, 627 (Fla. 1976).
With regard to the jury's award of $35,000 for past and future loss of wages and earnings, the uncontested evidence at trial indicated that Gandy's part-time wages ranged from $104.75 to $346.70 for a two-week period. Thus, the jury's award of damages is not contrary to the manifest weight of the evidence and the trial judge's discretion will not be overturned. With regard to the $300,000 awarded for injury to reputation and mental and emotional distress, although "mental pain and suffering damages must bear some reasonable relation to the facts of the case," Smith v. Goodpasture, 179 So.2d 240, 242 (Fla. 2d DCA 1965), such an award is left to the discretion of the jury unless it is clearly arbitrary or so great as to be shocking to the judicial conscience or unless it indicates that the jury was influenced by prejudice or passion. Georgia Southern & Florida Railway Co. v. Perry, 326 F.2d 921, 926 (5th Cir.1964). As stated by the court in Washwell, Inc. v. Morejon, 294 So.2d 30, 32 (Fla. 3rd DCA 1974), cert. denied, 310 So.2d 734 (Fla. 1975):
The burden is placed upon an appellant seeking to establish that a verdict is excessive to show that the award was the result of passion or prejudice, or that there was some misconception of the law or the evidence in the case, or that the jury did not consider all the elements of damages involved, or failed to consider the issues, or some other improper motive.
In the instant case, Albritton has failed to meet his burden of showing that the jury's award of damages for Gandy's loss of employment as a relief EMT is excessive. Thus, it cannot be said that the trial court abused its discretion in failing to grant *389 Albritton's motion for new trial and directed verdict on the issue of his tortious interference with Gandy's employment as a relief EMT.
However, with regard to the trial court's order granting Albritton's post-trial motion for directed verdict in favor of Albritton on the issue of Albritton's tortious interference with Gandy's employment as ombudsman at University Hospital, we reverse. In his order, the trial judge stated as follows:
(2) With respect to the issue of [Albritton's] liability for [Gandy's] loss of employment as Community Ombudsman at University Hospital, the court finds that the verdict is inconsistent with the evidence; and therefore, grants [Albritton's] Motion For Judgment In Accordance With The Motion For Directed Verdict as to this issue.
In reviewing a directed verdict, an appellate court must consider the evidence in a light most favorable to the party moved against and resolve all inferences in favor of that party. Trend Realty of Gainesville, Inc. v. Bullard, 461 So.2d 298, 299 (Fla. 1st DCA 1985). Thus, where the evidence as a whole, with all reasonable inferences drawn therefrom, allows a jury to lawfully return a verdict for the non-moving party, a trial court will commit error if it grants a motion for directed verdict under such circumstances. Id. In the instant case, the court did not make a finding that no reasonable interpretation of the evidence supported Gandy's claim. Rather, the court directed a verdict in favor of Albritton by finding that the jury's verdict was "inconsistent with the evidence." However, not only does the trial court's stated reason fail to support the directed verdict, a review of the evidence in this case also fails to support a directed verdict on this issue in favor of Albritton.
The Florida Supreme Court has held that a trial judge's stated reason that a verdict is inconsistent with the evidence is not a sufficient ground upon which to grant a new trial. Hodge v. Jacksonville Terminal Co., 234 So.2d 645, 647 (Fla.), cert. denied, 400 U.S. 904, 91 S.Ct. 142, 27 L.Ed.2d 141 (1970). If such a finding is insufficient to support a new trial, such a finding is clearly insufficient to support a directed verdict. Additionally, consideration of the evidence in a light most favorable to Gandy reveals that there is more than sufficient evidence to warrant the jury's finding that Albritton was responsible for Gandy's termination from her full-time ombudsman position at University Hospital. The evidence indicates that Albritton threatened to make sure that Gandy would never receive another job in Escambia County. Both county administrator Kendig and county administrator Bates testified that Albritton told them that he did not want Gandy employed at University Hospital. Albritton's position on Gandy's employment was related to county administrator Ellis through Bates. Although Ellis testified that he terminated Gandy because of the financial condition of University Hospital, it was also clear that Ellis did not have much experience in hospital administration and that Ellis made no inquiries about the nature of Gandy's duties and responsibilities at University Hospital before he terminated her. Clearly, the jury could have inferred that Ellis' knowledge of Albritton's position on Gandy's employment could have played an important part in Ellis' termination of Gandy. Although the evidence surrounding Gandy's discharge from University Hospital was conflicting, it is within the province of the jury, and not the trial judge, to resolve the conflicts in the testimony. Accordingly, we reverse the trial court's order directing a verdict for Albritton on the issue of Albritton's liability for tortious interference with Gandy's employment as ombudsman for University Hospital.
However, we also recognize that because the trial court directed a verdict for Albritton on the issue of liability, the trial judge never reached the question of whether the jury's award of damages to Gandy for Albritton's interference with her employment as ombudsman for University Hospital was excessive, even though Albritton requested the trial court to make such a determination in his post-trial motion for new trial and directed verdict. Accordingly, *390 we would remand this issue to the trial judge for his determination of whether the jury's award of $145,000 for past and future loss of wages and $700,000 for injury to reputation and mental and emotional distress on the issue of Albritton's tortious interference with Gandy's hospital employment was excessive and, if so, for entry of an appropriate remittitur or an order setting a new trial on the damages.
Finally, with regard to the issue of punitive damages, the trial court made the following statement in its order:
(8) The jury's verdict for awarding punitive damages in the sum of one million dollars ($1,000,000) when viewed in light of the Defendant's net worth and the manner in which the issue was submitted to the jury by this court requires the court to grant Defendant's Motion For New Trial.
For the following reasons, we find that the trial court erred in granting a new trial on Albritton's liability for punitive damages.
Courts will hold punitive damages excessive only in unusual circumstances. Wackenhut Corp. v. Canty, 359 So.2d 430, 436 (Fla. 1978). However, "where the punitive damages awarded bears no relation to the amount the defendant is able to pay and results in economic castigation," courts are correct in determining that the amount of a verdict for punitive damages is excessive. Id. As stated by the Florida Supreme Court in Arab Termite and Pest Control of Florida, Inc. v. Jenkins, 409 So.2d 1039, 1043 (Fla. 1982), "[p]unitive damages should be painful enough to provide some retribution and deterrence, but should not be allowed to destroy the defendant." Thus, an award of punitive damages may be reduced if it is out of all proportion to the defendant's net worth. See also Zambrano v. Devanesan, 484 So.2d 603, 609 (Fla. 4th DCA), rev. denied, 494 So.2d 1150 (Fla. 1986).
Although it is proper to set aside a jury's verdict if it appears that the award is out of all proportion to the defendant's net worth, in the absence of evidence of a defendant's net worth, an appellate court cannot say that an award is excessive. Bould v. Touchette, 349 So.2d 1181, 1187 (Fla. 1977); Louisville and Nashville Railroad Co. v. Hickman, 445 So.2d 1023, 1028 (Fla. 1st DCA 1983); rev. dismissed, 447 So.2d 887 (Fla. 1984). Furthermore, it is incumbent upon a defendant to present evidence of net worth so that a jury might be prevented from assessing an unusually harsh penalty. Evering v. Smithwick, 526 So.2d 185 (Fla. 3rd DCA 1988); Papcun v. Piggy Bag Discount Souvenirs, Food & Gas Corp., 472 So.2d 880 (Fla. 5th DCA 1985). As stated by the court in Papcun, 472 So.2d at 882:
To preserve his right to contend on appeal that an award of punitive damages is excessive, it is incumbent on the defendant to introduce evidence of his net worth, if evidence has not been introduced by plaintiff, and in the absence of such evidence an appellate court cannot say that an award of punitive damages is excessive in that it would bankrupt the defendant.
The recent case of Evering v. Smithwick is factually similar to the instant case. In that case, the court noted that although the record contained evidence of the defendant's present yearly income, the defendant failed to introduce evidence of his net worth. "Consequently, there is no evidence in the record to substantiate the claim that the punitive damage award would bankrupt ... [the defendant], so the award must be sustained." 526 So.2d at 187.
In the instant case, as in the Evering case, the only evidence that the jury heard regarding Albritton's financial status was evidence put on by Albritton that he made a salary of approximately $31,000 per year as a county commissioner. Albritton also admitted that he owned property in Escambia County, although how much property he owned was never indicated. Albritton failed to introduce evidence at the trial of his net worth. However, Albritton attempts to persuade this court on appeal that the jury's award of punitive damages in the amount of $1,000,000 will bankrupt and destroy him. Although it may well be that a $1,000,000 punitive damage award *391 against Albritton would, in all likelihood, bankrupt him, prompting us to remand the case to the trial court for an evidentiary hearing in order for the trial judge to set an appropriate remittitur of the punitive damages award, we are compelled by the case law in Florida to affirm the jury's award of punitive damages in the absence of any evidence of Albritton's net worth. We are bound to follow the case law on this issue even though to do so may result in economic castigation and bankruptcy of Albritton. Clearly such a result is contrary to the Florida Supreme Court's directive that punitive damages may not be assessed in an amount which will clearly bankrupt or destroy a defendant. Arab Termite and Pest Control v. Jenkins; Wackenhut Corp. v. Canty. Because we do not believe that a punitive damages judgment should be permitted to bankrupt a defendant, and that such result can be avoided only by a post-trial evidentiary hearing on that specific matter, we certify the following question to be of great public importance:
WHERE IT IS CONTENDED BY APPELLANT THAT THE AMOUNT OF A JURY'S AWARD OF PUNITIVE DAMAGES WOULD BANKRUPT A DEFENDANT, BUT THE DEFENDANT HAS FAILED TO PRESENT EVIDENCE OF NET WORTH TO THE JURY AT THE TRIAL BELOW, IS THE APPELLATE COURT COMPELLED TO AFFIRM THE JURY'S AWARD OR MAY THE APPELLATE COURT REMAND THE CASE TO THE TRIAL COURT FOR AN EVIDENTIARY HEARING IN ORDER FOR THE TRIAL COURT, IF WARRANTED, TO SET AN APPROPRIATE REMITTITUR?
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
THOMPSON and ZEHMER, JJ., concur.