# Third District Court of Appeal

## State of Florida

Opinion filed November 4, 2020.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-2096
Lower Tribunal No. 13-18247
_____


**Orlando Martinez de Castro, et al.,**
Appellants,

vs.

**Philip K. Stoddard, etc.,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Martin Zilber, Judge.

Amlong & Amlong, P.A., and William R. Amlong and Karen Coolman Amlong (Fort Lauderdale); The Franqui Firm, and Anthony G. Franqui (Fort Lauderdale), for appellants.

Roberts, Reynolds, Bedard & Tuzzio, PLLC, and George P. Roberts, Jr. and Lyman H. Reynolds, Jr. (West Palm Beach), for appellee.


Before EMAS, C.J., and HENDON and LOBREE, JJ.

EMAS, C.J.

Orlando Martinez de Castro ("Martinez de Castro"), the plaintiff in the trial court, was at all material times the chief of police for the City of South Miami. Philip K. Stoddard ("Stoddard"), the defendant in the trial court, was at all material times the mayor of the City of South Miami. Martinez de Castro sued Stoddard, in his individual capacity, for defamation. The trial court entered final summary judgment in favor of Stoddard, concluding that statements Stoddard made about Martinez de Castro in Stoddard's blog and in a letter to the public and city residents were not actionable because Stoddard (as city mayor) was entitled to absolute immunity.

On appeal, Martinez de Castro contends the trial court erred in finding Stoddard immune from suit for defamation where—according to Martinez de Castro—Stoddard was not acting within the scope of his duties and responsibilities as mayor when he made the statements that form the basis for Martinez de Castro's lawsuit. We find no error and affirm.

**FACTS AND BACKGROUND**

Martinez de Castro was the chief of police for the City of South Miami from 2010 to 2013, when he was fired. Stoddard was elected mayor of the City of South Miami in February 2010 and reelected in 2012, serving as mayor during Martinez de Castro's tenure as chief of police. Under the City Charter, Mayor Stoddard was a voting member of the City Commission, presided over Commission meetings, and

was recognized as the head of the City of South Miami government for ceremonial purposes.

The City Charter provides that the City Commission may conduct investigations into the affairs of the City and the actions of any City department, board, officer or agency. The Commission has the power to appoint the City Manager, who serves at the pleasure of the Commission. The City Manager has the power to appoint and remove City department heads. However, the appointment of a department director requires the consent of a majority of the Commission. In a 2010 resolution, the Commission approved the hiring of Martinez de Castro and his employment contract with the City.

During his tenure as mayor, Stoddard created a blog located at http://MayorStoddard.blogspot.com. On his blog, Mayor Stoddard posted several statements critical of Chief Martinez de Castro in a post titled "My efforts to clean up city government." The post detailed alleged unethical conduct by Chief Martinez de Castro (and others), including the mishandling of forfeited property and funds, and the directing of city staff to purchase services from businesses owned by members of Chief Martinez de Castro's family. The blog also noted that four ethics charges were then pending against Chief Martinez de Castro. Documents were appended to the posts in ostensible support of Mayor Stoddard's assertions about the police chief.

3

In a separate post (and in a "Dear Neighbors" letter to City of South Miami residents), Mayor Stoddard responded to accusations that he (Stoddard) engaged in inappropriate sexual conduct with his adopted daughter and an exchange student living in his home. In addressing the allegations, Mayor Stoddard accused Chief Martinez de Castro of adding "evidence" to the police file pertaining to this allegation of sexual misconduct. The following are the concluding paragraphs from Mayor Stoddard's letter:

> Who feels safe with this man running the South Miami Police Department? If a corrupt police chief will do these things to the elected Mayor, just imagine what he would do to the average citizen, or a member of our minority community, or a visitor? If you got on the wrong side of this police chief, what would he do to YOU?

> THAT is the real story here. And it's a shame, not only because our city does not deserve such abuse, but because it discourages rational and responsible people from taking part in municipal governance. I ran for Mayor to serve my fellow citizens and to make our city a better place to live. Instead I am embroiled in a morass of shenanigans, corruption, and cronyism. But cleaning up this mess is necessary for our future as a city, so I remain undeterred. This corrupt excuse for a law enforcement official MUST GO.

Stoddard signed the letter as Mayor of South Miami and encouraged residents to "read more at MayorStoddard.blogspot.com."

Based on the statements described above, Martinez de Castro filed the underlying defamation action against Stoddard.[1]

---

[1] Earlier the same year, Martinez de Castro sued the City for breach of his employment contract, and shortly thereafter, the City Commission terminated his

4

After approximately five years of discovery, Stoddard filed a motion for summary judgment. Attachments to the motion included the blog posts, the letter, and Stoddard's deposition. In his deposition, Stoddard testified that one of his duties as mayor was to communicate with the city residents and the general public in an effort to explain the function, operations and decisions of the City of South Miami government and its officials, and that he started the blog, in part, "because city commission meetings are a conventional place to communicate with the public, but they run long." There was a need, he explained, for "an alternative forum for communicating with the residents of the city." He further testified that he wrote the blog in his capacity as the elected mayor of South Miami.

At the conclusion of the hearing on the motion, the trial court granted summary judgment based on absolute immunity:

> [T]he Mayor was acting in his capacity as – may have been at all times, and it does have absolute immunity, and the motion for summary judgment is going to be granted. As much as, again, and I'm happy to be on record saying it, I don't think that the Mayor's behavior was appropriate or right. It doesn't mean that it wasn't acting as a public official down here, and that's why we lose faith in our public officials. But he certainly was acting as a mayor when he did it, based on what he did as a mayor.

---

employment. Martinez de Castro obtained a judgment totaling nearly $500,000 in damages and interest. The judgment was affirmed in City of South Miami v. Martinez de Castro, 244 So. 3d 267 (Fla. 3d DCA 2017).

The trial court later entered final judgment for Stoddard, and this appeal followed.

**ANALYSIS AND DISCUSSION**

"The question of whether allegedly defamatory statements are absolutely privileged is one of law to be decided by the court and consequently is ripe for determination on motion for summary judgment." Quintero v. Diaz, 300 So. 3d 288, 290 (Fla. 3d DCA 2020) (quotation omitted). This Court reviews summary judgment de novo. Volusia Cty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000).

Martinez de Castro contends that, in 2012, Stoddard did not enjoy absolute immunity from suit for defamation for his statements about Martinez de Castro in the blog and letter, e.g., that Martinez de Castro was "a corrupt police chief" and a "corrupt excuse for a law enforcement official [who] MUST GO!" This was so, Martinez de Castro argues, because at the time the statements were made, Stoddard was a ceremonial mayor and as such did not have the authority to hire, fire or supervise the chief of police.

"The public interest requires that statements made by officials of all branches of government in connection with their official duties be absolutely privileged." Crowder v. Barbati, 987 So. 2d 166, 167 (Fla. 4th DCA 2008) (quoting Hauser v. Urchisin, 231 So. 2d 6, 8 (Fla. 1970)). Florida courts have explained "that

6

democracy needs 'free and open explanations' of governmental actions and the right to this absolute privilege is a function of that necessity." Id. (quotation omitted) However, there are limits to this privilege: "[T]he controlling factor in deciding whether a public employee is absolutely immune from actions for defamation is whether the communication was within the scope of the officer's duties." Quintero, 300 So. 3d 291 (quoting City of Miami v. Wardlow, 403 So. 2d 414, 416 (1981)); see also Albritton v. Gandy, 531 So. 2d 381, 387 (Fla. 1st DCA 1988) (noting: "[I]n actions against a government official for defamation, public officials are protected by absolute immunity no matter how false or malicious or badly motivated a statement may be as long as the statements or actions fall within the 'scope of duty' of the public official."); Hauser v. Urchisin, 231 So. 2d 6, 7 (Fla. 1970) (finding absolute immunity in defamation action where the city attorney remarked of a commissioner to a newspaper: "First, Mr. Urchisin's respect for the truth is not famous. And second, I know he considers his services invaluable to the City, but the taxpayers might consider them to be awfully, awfully expensive.") The scope of a public official's duties is to be "liberally construed." Cassell v. India, 964 So. 2d 190, 194 (Fla. 4th DCA 2007). Therefore, the only question here is whether Stoddard was acting within the scope of his duties as mayor when he made the statements that form the basis for Martinez de Castro's lawsuit.

7

In support of the contention that Stoddard is not entitled to absolute immunity, Martinez de Castro relies nearly exclusively on Albritton, 531 So. 2d at 381. However, we agree with the trial court that the underlying facts, and the cause of action in that case, render it distinguishable from this case.

In Albritton, Louise Gandy ran against Grady Albritton and four other candidates for a seat on the Escambia County Board of County Commissioners. To run in the election, Gandy had to resign her position as Director of Emergency Medical Services for Escambia County. Id. at 383.

None of the candidates garnered a majority of the votes, requiring a runoff election. Albritton made the runoff, but Gandy did not. Albritton asked Gandy to endorse him for the runoff election, and Albritton said he would get Gandy her job back as Director of Emergency Medical Services if she would support him in the runoff. Gandy declined, telling Albritton she thought him to be a dishonest person who should not be in county government. Albritton became angry, telling Gandy he was going to win the election and that when he did win, he would see to it Gandy never got another job working for the county. Id. at 384.

Following her unsuccessful campaign, Gandy was hired as a Community Ombudsman at a county hospital. When Gandy began her work at the hospital, she was not a county employee, but instead worked for a private management firm contracted to operate the hospital.

Meanwhile, Albritton began his term as a county commissioner. As a county commissioner, Albritton did not have the authority to hire or fire county employees. Nevertheless, he contacted the county administrator, inquiring about Gandy's employment and seeking to have Gandy fired from her job. He was advised that Gandy was not a county employee and that the county administrator had no authority to fire her. Albritton however persisted in these efforts to effectuate Gandy's termination and contacted the county administrator a second time seeking to have Gandy fired. Again, Albritton's efforts met with no success.

Three things changed thereafter: First, Gandy obtained part-time work with the county as a relief emergency medical technician (EMT). Second, the county administrator who had repeatedly rebuffed Albritton's efforts to fire Gandy, left that position and was replaced by a new county administrator. Third, the county (and the county administrator) took operational control over the county hospital where Gandy worked as community ombudsman, including the hiring and firing of personnel.[2] Id. at 385.

Albritton renewed his efforts to have Gandy fired from her county positions and eventually succeeded. Gandy sued Albritton for tortious interference with a

---

[2] The new county administrator rejected Albritton's efforts to have Gandy terminated, reminding him that Gandy's employment as community ombudsman was through a private management firm. Albritton replied: "[w]e will have to do something about that," following which Escambia County canceled its contract with the consulting firm that had been operating the hospital.

business relationship. Albritton defended the suit by asserting he was entitled to absolute immunity. The case proceeded to trial and the jury returned a verdict in favor of Gandy on her claim of tortious interference. On appeal, the First District rejected Albritton's contention that he was entitled to absolute immunity:

> In the instant case, Albritton argues that the statements he made and actions he took regarding Gandy were within the scope of his authority. However, a review of the evidence indicates that this is not true. The statements made by Albritton were not made while Albritton was exercising an official duty. Albritton was not in charge of hiring or firing, and thus, there was no official purpose for Albritton's statements regarding Gandy's county employment.

Id. at 387.

Albritton's actions and statements were not directed to county residents; instead, they involved private conversations with a county administrator, and were single-mindedly targeted to effectuate the firing of Gandy. Albritton had no supervisory authority over Gandy, nor any responsibility regarding her performance as a county employee. In short, there was no official purpose for Albritton's actions or statements, other than to have Gandy terminated from county employment. These actions and statements thus cannot be characterized as falling within the scope of his duties and responsibilities as a county commissioner.

Albritton's actions and conduct also bore directly on Gandy's proof of an essential element of her claim—that Albritton intentionally and **unjustifiably** interfered with Gandy's employment. In other words, because Albritton had no

10

authority to supervise, hire or fire Gandy, and because there was no official purpose to Albritton's actions and statements, the jury properly concluded his actions constituted an intentional and unjustified interference with Gandy's employment relationship. Compare Fiberglass Coatings, Inc. v. Interstate Chem., Inc., 16 So. 3d 836, 838 (Fla. 2d DCA 2009) (providing the elements for a tortious interference with business relationship claim: "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship") with Valencia v. Citibank Int'l, 728 So. 2d 330, 330 (Fla. 3d DCA 1999) (holding: "To state a cause of action for defamation, in Florida, a plaintiff must allege that (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff").

By contrast, the instant case involves a city mayor's public statements regarding the conduct and performance of the city's chief of police. As described earlier, Mayor Stoddard was a voting member of the City Commission and served as its presiding officer. And while it is true that Mayor Stoddard's position was in part ceremonial, it is also true that the City Commission is empowered under the City's Charter to conduct investigations into the affairs of the City and the actions of any City department, board, officer or agency. Further, the hiring or appointment

11

of a department director (such as the chief of police) requires the consent of a majority of the Commission members.

Mayor Stoddard's blog post and letter regarding the actions and conduct of Chief Martinez de Castro fell within the scope of his duties as mayor—to keep his constituents informed of current events and operations within the City of South Miami and its government, including the operations and performance of his police department and its police chief. See Johnsen v. Carhart, 353 So. 2d 874, 876-77 (Fla. 3d DCA 1970) (observing that absolute immunity of a public official operates to relieve him or her from the necessity of being subjected to trial for actions based on privileged conduct, where "the action of the official was taken in the interest of the public good and thereby within the scope of his duties and responsibilities.") While some may have viewed Stoddard's statements as unworthy of an elected official, this does not alter the ultimate determination that they were absolutely privileged, and as such Stoddard was entitled to immunity from Martinez de Castro's suit for defamation. See Cassell, 964 So. 2d 195 (noting: "The fact that [the defendant's] statement may be viewed as having an unworthy or non-public purpose does not destroy the privilege.") See also Albritton, 531 So. 2d 387 (observing that "in actions against a government official for defamation, public officials are protected by absolute immunity no matter how false or malicious or badly motivated

a statement may be as long as the statements or actions fall within the 'scope of duty' of the public official").

## **CONCLUSION**

Because the trial court properly determined that the statements made by Stoddard in his blog and his letter to city residents were made within the scope of his duties as mayor of the City of South Miami, we affirm the final summary judgment entered in favor of Stoddard.

Affirmed.